## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| SHAWN L. STAFFORD, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | **Case No. 12-CV-2253** |
| | ) | |
| DR. PAUL TALBOT, | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION

This case is before the court for ruling on the Motion for Summary Judgment (#60) filed by Defendant Dr. Paul Talbot.  This court has carefully considered Defendant's Motion (#60), Plaintiff's Response (#65), Defendant's Reply (#66), and all of the documents provided.  Following this careful and thorough consideration, Defendant's Motion for Summary Judgment (#60) is GRANTED.

FACTS[1]

Plaintiff is an inmate incarcerated with the Illinois Department of Corrections at the Danville Correctional Center.  Defendant is a physician licensed to practice medicine in the State of Illinois and has been the Medical Director at the Danville

---

[1]  The facts are taken from Defendant's Statement of Undisputed Material Facts and Plaintiff's Response to these facts, as well as the documents filed by the parties. This court has only included facts which are material to the issues in this case and are adequately supported in the record.  This court has not included many of the facts recited by the parties regarding Plaintiff's skin condition.  In his Response to Defendant's Motion for Summary Judgment, Plaintiff stated that these facts are "germane" to his claims, but clearly stated that he "has consistently emphasized his spinal injury as the serious medical need for which this Complaint was filed" and also stated that he "has not insinuated that his seborrheic dermatitis is a serious medical condition."

Correctional Center since October 26, 2009. Plaintiff testified at his deposition that he injured his back in a fall in 2000, before he was incarcerated. Defendant first saw Plaintiff on November 16, 2009, for complaints of chronic low back pain. Defendant's physical examination showed that Plaintiff walked with a normal gait and no antalgia, which means there was no evidence of pain, such as limping. Plaintiff's straight leg raise (SLR) test was normal. The SLR test is done by placing the patient on his back and passively lifting one leg either while the patient is seated or lying down. This SLR test is to check for radiculopathy, meaning a nerve that is under tension anywhere from the lumbar disc to the ankle. On November 16, 2009, Plaintiff had normal muscle tone and strength. Defendant stated in his affidavit that his assessment that day was non-specific pain that was inconsistent with the examination. Plaintiff had been taking 600 mg of Ibuprofen twice per day. Defendant made no new medication orders but advised Plaintiff that he could get Tylenol or Ibuprofen through the commissary. According to Plaintiff, the commissary did not offer Ibuprofen. Plaintiff stated that he was able to get prescriptions for Ibuprofen from a psychiatrist and a P.A.

Plaintiff saw a physician assistant (PA) in April 2010. The PA had reviewed X-rays done in 2001 and 2009, which he noted showed degenerative changes at the sacroiliac joints, which are the joints between the sacrum and the ilium of the pelvis. The PA wrote Plaintiff a prescription for Ibuprofen 600 mg twice per day for two months for pain and also gave Plaintiff medication for his skin condition, including T-gel shampoo. The Ibuprofen was renewed on July 19, 2010.

Defendant saw Plaintiff on December 3, 2010, for medication renewal. On that

visit, Plaintiff got up from the stool and walked normally with no antalgia. Defendant performed a Patrick's or figure four test, which is a manipulation designed to elevate the hip and sacroiliac joint, and is done by flexing, abducting, and externally rotating the leg. This test elicited mild tenderness more on the left than the right with less than full extension on the left. Defendant's assessment was non-specific degenerative joint disease of the left hip. Defendant prescribed Ibuprofen 600 mg twice per day for two weeks.[2] Defendant also ordered an X-ray of the left hip. The X-ray report, dated December 9, 2010, showed no fracture or significant arthritic change.

Plaintiff testified at his deposition that he could have put in for sick call when his two week supply of Ibuprofen ran out, but he did not do that. Plaintiff testified that, instead, he tried to get Mary Miller, the Medical Department Administrator, to review the situation. Plaintiff testified that he filled out a grievance and the grievance counselor put him in to see P.A. Tindera. Plaintiff saw Tindera on March 28, 2011, for complaints of dermatitis capitis and low back pain with radiculopathy. Tindera provided T-gel shampoo, Naproxen (500 mg twice per day) and Neurontin (300 mg three times per day). Defendant stated in his affidavit that Neurontin (Gabapentin) is an anti-seizure medication that is sometimes prescribed to treat nerve pain. Plaintiff saw Tindera again on May 20, 2011, for complaints of dermatitis of the scalp and lumbar radiculopathy or radiating pain or weakness. Tindera provided T-gel shampoo for the dermatitis and Naproxen 500 mg twice per day for three months. Tindera also

---

[2] Plaintiff says Defendant just gave him a "card" with this medication. This court concludes that this is not a dispute over a material fact.

increased the Neurontin to 300 mg twice in the morning and three times in the evening and prescribed Tramadol 50 mg at bedtime.  Tramadol is a narcotic-like pain reliever for severe pain.

Tindera also ordered a low-back X-ray.  The X-ray report, dated May 26, 2011, stated:

> FINDINGS: There is grade I anterolisthesis at L5/S1, likely due to chronic bilateral pars defect.  The anterolisthesis appears more prominent on the flexion position, indicating dynamic instability.  Mild degenerative changes are seen at this level with osteophyte formation.  The vertebral body heights are maintained without fracture.

In his affidavit, Defendant explained that a defect to the pars interarticularis portion of the vertebrae[3] is similar to a stress fracture.  It may be congenital or due to stress, injury, or overuse.  A pars defect is not uncommon and is often asymptomatic; however, if the fracture gap widens, instability can cause the L5 vertebrae to shift anteriorly over the sacrum, which is known as spondylolisthesis.[4]  Depending on the severity, this anterior displacement can compress nerves and cause pain.  Grade I slippage is the lowest degree and should be asymptomatic.  Plaintiff's X-ray report indicated a grade I

---

[3] "The pars interarticularis is a portion of the lumbar spine.  It joins together the upper and lower joints."  This definition is from the website of the American Academy of Orthopedic Surgeons found at http://orthorinfo.aaos.org.

[4] Anterolisthesis, as stated in the X-ray report, "is basically another term for spondylolisthesis."  http://www.spine-health.com/glossary.

spondylolisthesis, which is minimal anterior slippage. Plaintiff's X-ray report also noted secondary osteoarthritis, which is the wearing away of the smooth bony surfaces, causing grinding in the affected joint and resulting discomfort.

Plaintiff followed up with Tindera on June 20, 2011, regarding seborrheic dermatitis and low back pain. Tindera ordered additional films taken of the low back and increased Plaintiff's Neurontin to 900 mg twice per day for five months. The X-ray films confirmed the bilateral pars defect. The X-ray report, dated June 27, 2011, stated, "[b]reak in pars interarticularis is present bilaterally at L5-S1."

Defendant saw Plaintiff on August 31, 2011, on a request for renewal of pain medication. At this time, Defendant reviewed the X-ray reports finding SI joint osteoarthritis and grade I vertebral slippage. Defendant observed that Plaintiff walked with a normal gait and no antalgia. Defendant performed an SLR test, which was negative. Plaintiff was able to heel/toe walk. Defendant assessed SI joint osteoarthritis with no radicular pain. Defendant prescribed Naproxen, an anti-inflammatory medication, at 500 mg twice per day for 90 days. Plaintiff continued to receive Neurontin according to Tindera's June 20 prescription until that prescription ran out on November 18, 2011.

Defendant next saw Plaintiff on November 30, 2011, after he signed up on nurse sick call for medication renewal. On examination, Plaintiff again had a normal gait with no antalgia. The SLR test was negative on both sides. Defendant's assessment was (1) mild seborrhea and (2) a normal physical examination with regard to the back pain. Defendant prescribed Naproxen 500 mg twice per day for 30 days for back pain and

selenium sulfide shampoo for the skin condition.

Defendant next saw Plaintiff on January 6, 2012, after he signed up for a medication renewal. According to Plaintiff, he requested Neurontin, along with Naproxen and medicated shampoo. Defendant stated in his affidavit that Plaintiff reported that Naproxen helped his back and that T-gel shampoo worked better than selenium sulfide. Defendant prescribed T-gel shampoo and Naproxen 500 mg twice per day for 30 days.

Defendant saw Plaintiff again on February 1, 2012, for another medication renewal. Defendant again reviewed the May 2011 X-ray report. Defendant's physical examination showed Plaintiff in no acute distress. Plaintiff walked with a normal gait and no antalgia and had no tenderness of the lower back to palpation. A neurological examination for low back pain would normally consist of checking the deep tendon reflexes, performing a motor examination, and performing a sensory examination. The purpose is to identify nerve root impairment or a disc problem. Defendant checked Plaintiff's deep tendon reflexes by striking his knee and his ankle. It showed normal and bilateral deep tendon reflexes of the knees (for the L3-L4) and ankles (L5-S1). Defendant stated in his affidavit that Plaintiff was non-compliant with the voluntary portions of the motor examination, consisting of the left great toe dorsi flexion to check the L5 nerve root and L5-S1 interspace and the left foot plantar flexion for the S1 nerve root and S1-S2 interspace. The straight leg raise was negative while seated on both the left and right. Defendant's assessment was lumbar osteoarthritis per X-ray but intact S1 root (S1-S2 interspace) and L5 root (L5-S1 interspace). Defendant found that Plaintiff's

subjective description of sensory radiation in the left foot was consistent with left S1-S2 distribution but objectively he had intact left deep tendon S1 reflexes judged by the left ankle jerk, suggesting no impairment. Defendant noted that sensory testing was deferred due to Plaintiff's lack of compliance with the motor testing.[5] Defendant renewed the T-gel shampoo and prescribed Naproxen 500 mg twice per day for 90 days for the osteoarthritis.

Defendant saw Plaintiff again on May 9, 2012, for medication renewal. Plaintiff reported an onset of pain in 2000 when he fell off of a log while doing a log jam removal. Plaintiff testified that his original physician in 2000 did not suggest surgery, telling Plaintiff he would have a 65% chance of getting better and a 35% chance of actually being worse than he was before the surgery. Plaintiff reported that triggers for pain are the weather and that it was worse when it was cold and wet outside. According to Defendant, Plaintiff's triggers for pain are consistent with osteoarthritis/degenerative joint disease. Plaintiff reported that his pain was better with Naproxen and Neurontin. Plaintiff reported that the pain felt like an ice pick, while pointing to L4-L5 disc space on the left side that radiates down his buttocks and posterior thigh with electric shock in his thigh and calf and burning in his calf down to the bottom of his foot.

Defendant noted that, objectively, Plaintiff was in no acute distress. The SLR test

---

[5] In his Response, Plaintiff stated that Defendant did an Achilles test and, when Plaintiff did not exhibit a reflex on his left side, Defendant erroneously found Plaintiff failed to comply with the test. Plaintiff did not provide an affidavit in support of this assertion.

was negative. The figure-four test for hip pathology was positive on the left but there was no palpable tenderness. Neurological testing of the deep tendon reflexes was normal. Strength testing that required full effort and participation from Plaintiff showed motor and sensory deficits on the left. However, there was no corresponding quadriceps, hamstring, or calf muscle atrophy, as the calves were equal in diameter. Defendant stated in his affidavit that, if there was significant and chronic nerve denervation, it would cause the patient to use the affected side less and favor the other side. One would then expect to see atrophy and muscle asymmetry. Plaintiff had no disuse atrophy on the left side.

Defendant's assessment was (1) a subjective report of left lower extremity pain with intact reflexes and no disuse atrophy; (2) SI joint osteoarthritis per X-ray; (3) Grade 1 anterolisthesis at L5-S1 per X-ray; (4) rule out vasculopathy (disease of blood vessels) at left lower extremity; and (5) seborrhea capitis. As a follow-up to his assessment to rule out vasculopathy, an ankle brachial index test (ABT) was done on May 30, 2012. The test measures the blood pressure at the ankle and is done to check for peripheral artery disease. Plaintiff's ABT was normal, ruling out vasculopathy.

Defendant stated in his affidavit that X-ray reports from 1997 and 2000 contained in Plaintiff's medical file show spondylolysis with a grade I spondylolisthesis (anterior slippage). Defendant stated that, based upon the X-rays taken in 2011, which also showed grade I anterolisthesis, there has been no progression in approximately 10 to 15 years. Accordingly, the spondylolisthesis is chronic and stable. Defendant stated that, in his medical opinion, it does not require treatment, pose a risk of serious harm to

Plaintiff, or necessitate a referral to an orthopedic specialist. Defendant stated that, based on what Plaintiff reported to him, this was consistent with his prior physician's findings and treatment prior to Plaintiff's incarceration. Defendant stated that, to the extent Plaintiff complains of low back pain, it is likely due to osteoarthritis in the bilateral S1 joints and L5-S1 joint, which is managed conservatively and symptomatically with anti-inflammatory medications. Defendant's objective physical examinations have been negative, finding no neurological or motor deficits. Defendant stated that osteoarthritis poses no serious risk of harm to Plaintiff and has been managed with anti-inflammatory pain medication. Defendant stated that there is no indication to send Plaintiff to a specialist for his back pain and that Plaintiff received all care that was medically necessary.

The record includes an X-ray report dated February 4, 2013. This report states:

LUMBAR SPINE, THREE VIEWS 02/01/2013:

HISTORY: Chronic pain.

FINDINGS: Significant narrowing of the disc is seen at L5-S1 level with minimal anterolisthesis of L5 on S1 related to spondylolysis posteriorly.

Similar findings are noted previously on the examination of 05/24/11 as well, although the disc height has further diminished at L5-S1 level suggestive of progression of degenerative change.

There is no compression fracture.

The rest of the lumbar spine is stable.

PROCEDURAL HISTORY

Plaintiff filed his pro se Complaint (#1) on September 27, 2012. Plaintiff alleged that, on December 3, 2010, Defendant refused to renew a pain medication prescription despite years of fully documented need. Plaintiff alleged that he suffered pain until March 28, 2011, when he was prescribed pain medication by P.A. Tindera. Plaintiff alleged that Dr. Talbot again improperly refused to prescribe him pain medication around August 30, 2011.[6]

On September 26, 2013, Plaintiff filed a pro se Amended Complaint (#47). Plaintiff again alleged that, on December 3, 2010, Defendant refused to renew an analgesic (pain) medication despite years of fully documented need. Plaintiff alleged that for 115 days he suffered to the point that he could barely walk. Plaintiff alleged that, on March 28, 2011, P.A. Tindera immediately recognized his distress and ordered an analgesic, Naproxen, and also ordered Neurontin for the raw nerve pain he had developed during the aforementioned 115 days. Plaintiff further alleged that his pain was unrelenting on May 20, 2011, and he had to seek amplified medical assistance. Plaintiff stated that Tindera then renewed the Naproxen and added a powerful opiate, Tramadol. Plaintiff alleged that, on June 20, 2011, the Tramadol was allowed to expire and the Neurontin was increased. Plaintiff alleged that, on August 30, 2011, Tindera had moved on and Defendant renewed the Naproxen but refused the Neurontin. Plaintiff alleged that Defendant's decision to discontinue the Neurontin affected the

---

[6] Plaintiff also named Mary Miller and Keith Anglin as Defendants. Anglin was dismissed on January 25, 2013, and summary judgment was granted in favor of Miller on April 12, 2013.

damaged nerve profoundly.  Plaintiff alleged that, had Defendant properly weaned him

off of the Neurontin, he may have retained some level of benefit.  Plaintiff alleged that,

on January 30, 2013, he "received the amplified chemical therapy required to begin the

physical therapy, which enables Plaintiff to manage the pain of injury and more recent

aggravating factors."  Plaintiff sought compensatory damages for deliberate

indifference for the 115 days from December 3, 2010 to March 28, 2011, and for 500 days

from August 30, 2011 to January 30, 2013.  Plaintiff also sought punitive damages.

On October 1, 2014, Defendant filed a Motion for Summary Judgment (#60), with

attached exhibits, including the transcript of Plaintiff's deposition taken June 19, 2014,

Defendant's affidavit, dated October 1, 2014, and medical records.

On October 2, 2014, the clerk's office sent Plaintiff a Notice (#61) which stated:

> NOTICE IS HEREBY GIVEN that a case-dispositive motion
>
> (such as a motion for summary judgment or motion for judgment on
>
> the pleadings) has been filed.  See, Fed. R. Civ. P. 56.  Please be
>
> advised that you have **twenty-one (21)** days from the date of service
>
> to respond to the motion.  If you do not respond, the motion, if
>
> appropriate, will be granted and the case will be terminated without
>
> a trial.  See, generally, Lewis v. Faulkner, 689 F.2d 100 (7th Cir. 1982);
>
> Timms v. Frank, 953 F.2d 281 (7th Cir. 1992).
>
> When a motion for summary judgment is made and properly
>
> supported, you must not simply rely upon the allegations made in
>
> your complaint.  Rather, you must respond by affidavit(s) or as

otherwise provided in Rule 56 of the Federal Rules of Civil

Procedure, a copy of which is attached.  Your response must set forth

specific facts showing that there is a genuine issue of material fact for

trial.  If you do not submit affidavits or other documentary evidence

contradicting the defendants' assertions, the defendants' statement

of facts will be accepted as true for purposes of summary judgment.

**See Fed. R. Civ. P. 56(e) (attached).**

On October 3, 2014, Plaintiff filed a Motion for Appointment of Counsel (#63).

Plaintiff also filed, the same day, a Motion for Leave to File Amended Complaint (#62).

Plaintiff attached a proposed pro se Amended Complaint, with attachments.  Plaintiff

added allegations that, on December 3, 2010, Defendant refused to renew three

prescriptions Plaintiff used to manage chronic conditions of seborrheic dermatitis and

sciatica.  Plaintiff also clarified that Defendant first denied his Neurontin on November

30, 2011.

On October 28, 2014, Plaintiff filed a Motion for Extension of Time to file his

Response to the Motion for Summary Judgment (#64).  He asked for additional time,

until November 3, 2014, to file his Response.  On October 30, 2014, this court granted

Plaintiff's Motion (#64).  On October 31, 2014, Plaintiff filed his pro se Response to

Defendant's Motion for Summary Judgment (#65) with attached exhibits.  Plaintiff

attached copies of his medical records, but did not include an affidavit in support of his

statements in opposition to some of the Undisputed Material Facts set out by

Defendant.

On November 10, 2014, Defendant filed a Reply (#66). Defendant argued that Plaintiff's response to Defendant's Undisputed Material Facts largely consists of objections without any admissible support. For example, Plaintiff repeatedly stated that Defendant's statements are not reliable or have little basis in the truth. Defendant argued that these conclusions are unsupported by the record and are insufficient to defeat summary judgment.

ANALYSIS

I. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

A. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772 (7th Cir. 2012). Further, because Plaintiff is proceeding pro se, his pro se filings are to be liberally construed. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). However, a court's favor toward the nonmoving party does not extend to drawing inferences supported by only speculation or conjecture. *Harper v. C.R. England,*

*Inc.*, 687 F.3d 297, 306 (7ᵗʰ Cir. 2012).  A plaintiff's own subjective belief does not create a genuine issue of material fact.  *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 401 (7ᵗʰ Cir. 1997).

The party opposing summary judgment "must present definite, competent evidence in rebuttal."  *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7ᵗʰ Cir. 2004). In § 1983 cases, "the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forth with sufficient evidence to create genuine issues of material fact to avoid summary judgment."  *Padula v. Leimbach*, 656 F.3d 595, 600 (7ᵗʰ Cir. 2011), *quoting McAllister v. Price*, 615 F.3d 877, 881 (7ᵗʰ Cir. 2010). The court does not determine the truth of asserted matters, but rather decides whether there is a genuine factual issue for trial.  *Dykema v. Skoumal*, 261 F.3d 701, 704 (7ᵗʰ Cir. 2001); *Townsend v. Hinsley*, 2007 WL 731454, at *2 (S.D. Ill. 2007).

## B.  PLAINTIFF'S CLAIMS

Defendant argued that he is entitled to summary judgment on Plaintiff's claims because (1) Plaintiff's seborrheic dermatitis is not an objectively serious medical condition; (2) Plaintiff's pars defect/spondylolisthesis is not an objectively serious medical condition; (3) Defendant was not deliberately indifferent to Plaintiff's medical condition; and (4) Defendant is entitled to qualified immunity.

In his Response, Plaintiff has argued that the medical records are not consistent with Defendant's affidavit and show that Defendant refused to provide Plaintiff care for his back condition and show that his back condition deteriorated because he was denied needed medications.  Plaintiff has relied on the X-ray report from February 4, 2013,

which he contends shows that the condition of his back has gotten worse. As noted previously, Plaintiff has not argued that his skin condition is an objectively serious medical need, but instead contends that the treatment of this condition is "germane" to his claim regarding his spinal injury. Despite the notice sent to Plaintiff, he did not file an affidavit in support of his claims, but just attached copies of medical records to his response.

"The Supreme Court has interpreted the Eighth Amendment's prohibition against cruel and unusual punishment, as incorporated by the Fourteenth Amendment, to impose a duty on states 'to provide adequate medical care to incarcerated individuals." *Holloway v. Delaware County Sheriff*, 700 F.3d 1063, 1072 (7th Cir. 2012), *quoting Boyce v. Moore*, 314 F.3d 844, 888-89 (7th Cir. 2002) (*citing Estelle*, 429 U.S. at 103). In 1976, the United States Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,'" proscribed by the Eighth Amendment. *Estelle*, 429 U.S. at 104, *quoting Gregg v. Georgia*, 428 U.S. 153, 173 (1976). The Court stated that this was true "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care." *Estelle*, 429 U.S. at 104-05. The Court further stated that "[t]his conclusion does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *See Estelle*, 429 U.S. at 105. "To succeed on a deliberate indifference claim, a plaintiff must (1) demonstrate that his medical condition is 'objectively, sufficiently serious,' and (2) demonstrate that the defendant acted with a

15

'sufficiently culpable state of mind.'" *Holloway*, 700 F.3d at 1072, *quoting Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

"To demonstrate that a defendant acted with a 'sufficiently culpable state of mind,' a plaintiff must put forth evidence that the defendant knew of a serious risk to the plaintiff's health and consciously disregarded that risk." *Holloway*, 700 F.3d at 1073, *quoting Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006). "This subjective standard requires more than negligence and it approaches intentional wrongdoing." *Holloway*, 700 F.3d at 1073, *citing Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998). Indeed, the Seventh Circuit has consistently held that deliberate indifference "requires a showing of more than mere or gross negligence." *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012), *quoting Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006). The Supreme Court has compared the deliberate indifference standard to that of criminal recklessness. *Holloway*, 700 F.3d at 1073, *citing Farmer*, 511 U.S. at 837. The Seventh Circuit has "characterized the standard as imposing a high hurdle on plaintiffs because it requires a 'showing as something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Rosario*, 670 F.3d 816, 821, *quoting Collins*, 462 F.3d at 762.

Therefore, the Seventh Circuit has recognized that the Constitution is not a medical code that mandates specific medical treatment. *See Jackson v. Kotter*, 541 F.3d 688, 697-98 (7th Cir. 2008), *citing Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). A prisoner is not entitled to receive "unqualified access to healthcare." *Holloway*, 700 F.3d at 1073, *quoting Hudson v. McMillian*, 503 U.S. 1, 9 (1992). "Instead, prisoners are entitled only to 'adequate medical care.'" *Holloway*, 700 F.3d at 1073, *quoting Johnson*, 433 F.3d at

1013. "There is not one 'proper' way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field." *Jackson*, 541 F.3d at 697, *citing Snipes*, 95 F.3d at 592. "For a medical professional to be held liable under the deliberate indifference standard, he must make a decision that is 'such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment.'" *Holloway*, 700 F.3d at 1073, *quoting Jackson*, 541 F.3d at 697. The decision must be such a departure from established practice and judgment as to demonstrate "a complete abandonment of medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006).

First of all, this court agrees with Defendant (and Plaintiff) that Plaintiff's skin condition is not an objectively serious medical condition. This court further concludes that the treatment Plaintiff received for this condition has no relevance to whether Defendant was deliberately indifferent to any serious medical need of Plaintiff. This court notes, however, that the record shows that Plaintiff has received treatment for his skin condition, even though he did not always receive T-gel, the medication he preferred.

Second, this court concludes that, whether or not Plaintiff's back injury was an objectively serious medical condition,[7] Plaintiff has not presented sufficient evidence to

---

[7] This court notes that, in arguing that he has an objectively serious medical condition, Plaintiff asked this court to accept Loren Fishman, M.D. as an expert witness for Plaintiff. Plaintiff stated that Fishman is the author of "Sciatica Solutions; Diagnosis, Treatment, and Cure for Spinal and Piriformis Problems." In his Reply, Defendant pointed out that Plaintiff did not timely disclose Fishman as an expert and has not

establish a genuine issue of material fact regarding whether Defendant was deliberately indifferent. It is clear that Plaintiff was not satisfied with the medical care he received from Defendant. However, Defendant provided care and this court concludes that Plaintiff has fallen far short of presenting evidence that the care provided by Defendant was such a departure from established practice and judgment as to demonstrate "a complete abandonment of medical judgment." *See Norfleet*, 439 F.3d at 396-97.

In Plaintiff's case, his lumbar spine was X-rayed in May and June 2011, and the radiology reports document a bilateral pars defect with grade I spondylolisthesis or anterolisthesis. Plaintiff's medical file at Danville contains radiology reports of X-rays of Plaintiff's lumbar spine done in 1997 and 2000, before he came to prison. The bilateral pars defect and grade I spondylolisthesis were noted by the radiologist who reviewed those films. This court agrees with Defendant that this means that, after a lengthy period of time, the pars defect had not worsened. The slippage remained grade I which, according to Defendant, was generally asymptomatic. It appears from Plaintiff's medical records that this is a chronic and stable condition that has existed for many years. The record shows that Defendant did testing on multiple occasions and did not find that Plaintiff's actual medical condition was consistent with his complaints of pain. In any case, Defendant did provide Plaintiff with medication for his back pain. Plaintiff has complained, bitterly, that he was without medication from December 2010 to March 28, 2011, when he saw Tindera. However, it is undisputed that Plaintiff did

---

attached to his Response any documentation related to Fishman. This court therefore agrees with Defendant that Plaintiff's references to Fishman should be disregarded.

not ask Defendant for medication during that time. Plaintiff testified at his deposition that he could have put in for sick call when his two week supply of Ibuprofen ran out, but he did not do that. Plaintiff testified that, instead, he tried to get Mary Miller, the Medical Department Administrator, to review the situation. The evidence therefore shows that Defendant was not notified that Plaintiff needed medication at any time from approximately December 17, 2010, when Plaintiff's two week supply of Ibuprofen ran out, to March 28, 2011, when Tindera prescribed medication for him. It would be impossible to conclude that Defendant was deliberately indifferent to Plaintiff's serious medical need during that time when Plaintiff admittedly did not contact Defendant about his need for medication.

Starting on August 31, 2011, Defendant prescribed Naproxen for Plaintiff's back pain. Defendant stated in his affidavit that Plaintiff reported that the Naproxen he prescribed was effective in treating Plaintiff's pain. Plaintiff testified that Naproxen makes his pain "bearable" and that it is a more effective anti-inflammatory than Ibuprofen. However, Plaintiff has insisted that Neurontin was also beneficial and Defendant should have continued to prescribe Neurontin or, at least, weaned him slowly off of this medication. Plaintiff has provided no evidence to support this argument and this court agrees with Defendant that there are no objective findings which support Plaintiff's contention that he has nerve pain that requires the drug Neurontin. To the extent that Defendant's determination not to prescribe Neurontin after Plaintiff's prescription ran out on November 18, 2011, conflicts with Tindera's determination, this does not create a colorable claim. A disagreement among doctors

does not show deliberate indifference. *See Holloway*, 700 F.3d at 1073-74 (the prison physician "is free to make his own, independent medical determination as to the necessity of certain treatments or medications"). This court concludes that Plaintiff has not shown that Defendant was deliberately indifferent when he continued to prescribe only Naproxen for Plaintiff's back pain. Even though Plaintiff may disagree with the course of treatment he received, such a disagreement does not rise to the level of deliberate indifference. *See Estelle*, 429 U.S. at 107 (the plaintiff's claim that defendants were deliberately indifferent because they should have done more by way of diagnosis and treatment of his back injury was not cognizable under § 1983 where they treated the back injury with bed rest, muscle relaxants and pain relievers); *Schuenke v.. Wis. Dep't of Corrections*, 2000 WL 34236738, at *7 (W.D. Wis. 2000) (finding no deliberate indifference where the plaintiff's grade I spondylolisthesis was treated by recommending back exercises); *see also Snipes*, 95 F.3d at 592 (7th Cir. 1996) (a prisoner's dissatisfaction with a doctor's prescribed course not enough to show deliberate indifference). Plaintiff has not provided any evidence which could support a finding that Defendant's decision to prescribe Naproxen, but not Neurontin, is 'such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment.'" *See Holloway*, 700 F.3d at 1073-74.

At his deposition, Plaintiff testified that he would like to see a specialist to see if he needs to have an operation. Defendant has argued, persuasively, that, based on the tests he performed, there was no reason to refer Plaintiff to a specialist. Plaintiff

certainly does not agree with this assessment, but he has not supported his contrary opinion with any supporting documentation.  In fact, Plaintiff's physician prior to his incarceration advised against surgery for his back condition.  This court concludes that Plaintiff has not shown that Defendant was deliberately indifferent under these circumstances.  *See Johnson*, 433 F.3d at 1014 *(decision by medical professionals that surgery was not necessary was not deliberately indifferent).

Plaintiff has also argued that the X-ray report dated February 4, 2013, shows that his condition has become worse because of Defendant's refusal to provide treatment for his back condition.  Plaintiff argued that the X-ray report is "objective evidence that actually prove[s] the [Defendant] caused quantifiable, irreversible harm."  This court disagrees.  Even assuming that the X-ray report shows significant deterioration of Plaintiff's condition, which is not clearly and unambiguously true, Plaintiff's conclusion that this was caused by Defendant's refusal to prescribe Neurontin can only be based on speculation and conjecture.

For all of the reasons stated, this court concludes that Defendant is entitled to summary judgment on Plaintiff's claims.[8]  Defendant's Motion for Summary Judgment (#60) is granted.

## II.  PLAINTIFF'S MOTIONS

Plaintiff has filed a Motion for Leave to File Amended Complaint (#62). Plaintiff's proposed Second Amended Complaint just clarifies some of the allegations in

---

[8]  Because of this conclusion, this court does not need to consider Defendant's alternative argument that he is entitled to qualified immunity.

his prior Amended Complaint and does not add any allegations which have not been thoroughly discussed by this court in determining that Defendant is entitled to summary judgment on Plaintiff's claims. Plaintiff's proposed Second Amended Complaint would be futile, so his Motion for Leave to File Amended Complaint (#62) is denied. Plaintiff also filed a Motion for Appointment of Counsel (#63). Plaintiff stated that his imprisonment will greatly limit his ability to litigate his case and that having counsel would better enable Plaintiff to present evidence and cross examine witnesses. Because Defendant's Motion for Summary Judgment has been granted, there will not be a trial. Therefore, Plaintiff's Motion (#63) is denied.

IT IS THEREFORE ORDERED THAT:

(1) Plaintiff's Motion for Leave to File Amended Complaint (#62) is DENIED.

(2) Plaintiff's Motion to Request Counsel (#63) is DENIED.

(3) Defendant's Motion for Summary Judgment (#60) is GRANTED. Judgment is entered in favor of Defendant and against Plaintiff.

(4) This case is terminated.

ENTERED this 7th day of January, 2015.

/s/Harold A. Baker

_____
HAROLD A. BAKER
U.S. DISTRICT JUDGE